Filed 1/19/23  E.M. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| E.M. et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF RIVERSIDE COUNTY,<br><br>        Respondent;<br><br>RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>        Real Party in Interest. | E079860<br><br>(Super.Ct.No. SWJ2000156)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Donal B. Donnelly, Judge.  (Retired judge of the Imperial Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Petition denied.

Karl Fuller for Petitioner, E.M.

Will Trotter for Petitioner, D.B.

No appearance for Respondent.

1

Minh C. Tran, County Counsel, and Teresa K.B. Beecham and Prabhath D. Shettigar, Deputy County Counsel, for Real Party in Interest.

Petitioners E.M. (Mother) and D.B. (Father) seek review of the juvenile court's order removing their child, C.B., from their custody, denying family reunification services, and setting a selection and implementation hearing pursuant to Welfare and Institutions Code section 366.26. (Unlabeled statutory references are to this code.) C.B.'s two older siblings, B.B. and S.B., had been removed from Mother and Father, and family reunification services were terminated as to B.B. and denied as to S.B. On June 6, 2022, the juvenile court terminated both parents' parental rights as to B.B. and S.B.

Both parents argue the evidence is insufficient to support the removal of C.B. from their custody, and Mother also argues the evidence is insufficient to warrant bypassing her for reunification services.

We find no error and deny both parents' petitions and requests to stay the section 366.26 hearing.

BACKGROUND

In February 2020, the Riverside County Department of Public Social Services (DPSS) received a referral alleging general neglect of B.B. immediately after her birth. Roughly 10 days before B.B.'s birth, Mother was complaining of severe heartburn and was taken to a hospital by maternal grandmother (MGM). Mother was informed that she was pregnant and that she had tested positive for methamphetamine. Both Mother and MGM reported that this was Mother's first pregnancy, neither of them knew Mother was

2

pregnant until then, and Mother had believed that she could not conceive. MGM reported that Mother disclosed that she tested positive for methamphetamine and had "only used once." Medical records state that a hospital social worker reported on February 1, 2020, that Mother "'reported recreational [drug] use for at least a year.'" On February 10, 2020, another hospital social worker assessing Mother's substance abuse history reported that Mother "stated that she only used that one time in January" "due to stress." Medical records also note that Mother left the hospital against medical advice "while she was in active labor" because she did not want child protective services to take the child.

After B.B.'s birth, DPSS tried unsuccessfully to locate and meet with Mother and B.B. but was unable to do so until March 3, 2020. When the social worker asked about Mother's positive methamphetamine test from the previous month, Mother reported that the last time she used methamphetamine was when she was 21 years old (12-13 years earlier) and that she did not know why she had tested positive. At the March 3, 2020, meeting with the social worker, Mother submitted to a saliva drug test, which was also positive for both amphetamine and methamphetamine. Mother again denied any recent methamphetamine use. When the social worker asked if Mother was breastfeeding B.B., Mother acknowledged she was. Mother agreed to report for a urine drug test that day before 7:00 p.m. but failed to show up that day and again the next. A referral for substance abuse evaluation and treatment was provided to Mother, who reported the following day she had made appointments for both herself and Father.

At Father's initial interview on March 4, 2020, he told the social worker that both Father and Mother had been using methamphetamine on and off for the last 10 years. He reported they were both using daily, but he also said that he had last used methamphetamine six months ago. He also said his test might come up positive because of how much he used. Father agreed to submit to a saliva drug test, but it was inconclusive because of insufficient saliva. The social worker asked Father if Mother had been breastfeeding B.B., and Father denied that Mother had breastfed B.B. since they were discharged from the hospital. After the social worker told Father that Mother had acknowledged she was breastfeeding the previous day, Father continued his denials.

Two days later, B.B. was detained from both parents and placed with MGM. Father "became very upset," told the social worker, "'over my dead body will you take my child,'" and said that both the social worker and the supervisor "'will lose your jobs.'"

At the detention hearing, the court addressed Mother and Father, who were present in court, directly, telling them there was "a lot of information contained in [the detention] report about avoiding returning the calls of the social worker and about avoiding having contact with the Department," primarily by Mother, as well as about "very aggressive and confrontational behavior" on the part of Father. The court explained that behavior demonstrating that any parent is either "noncommunicative or confrontational and aggressive" will negatively affect "whether or not the court can find that there are any services that would prevent the need for further detention." The court explained that if

4

such behavior continues, it will also negatively impact the court's belief that "the parents will work cooperatively with [DPSS] in order to avoid the need for removal." The court urged both parents to "take a deep breath and recognize that we need to take a different approach if anything different here is going to happen."

Mother and Father were present in court the following day at the continued detention hearing. The court told Mother and Father "the collective total of the information that I have before me does tell me that you were doing everything in your power to avoid having any contact with the social worker, which then put you in a position to avoid having to do the test or avoid being caught under the influence. I just don't take those chances with a young child, and this is especially true when [Mother] has tested positive . . . for meth[amphetamine] not only just before the child was born but tested again positive on March 3rd. [¶] But on top of that I have mom telling . . . the social worker, yeah, she's breastfeeding the child. Dad's denying that mom's breastfeeding the child. People aren't being honest. If you're not honest, . . . I'm not going to interpret the difference to the detriment of the child. I can't do that."

The court ordered DPSS to provide case-appropriate referrals to both parents, including but not limited to parenting education, substance abuse treatment, counseling, and "any other services the social worker deems necessary." The court ordered that drug testing services continue, authorized drug testing at visitation, and ordered referrals for both parents for hair follicle drug testing and substance abuse treatment "forthwith." The court ordered that Mother and Father be allowed to reside in MGM's home with B.B.,

provided that they have submitted to their hair follicle drug testing and commenced substance abuse treatment programs and that MGM does not leave B.B. unattended in the presence of either parent at any time.

B.B was removed from both parents in July 2020, with family reunification services provided to both parents. During reunification, Mother completed parenting classes and was participating in individual counseling, but in February 2021 she was discharged from her substance abuse treatment program for noncompliance. Mother failed to submit to a court-ordered hair follicle drug test and otherwise failed to comply consistently with drug testing. Father completed parenting classes, was discharged from his individual counseling in February 2021 for poor attendance and lack of participation, and failed to participate in substance abuse treatment. Father failed to submit to a court-ordered hair follicle drug test and otherwise failed to comply consistently with drug testing. On March 17, 2021, DPSS recommended that reunification services be terminated as to both parents. In March and April 2021, multiple documents submitted by Mother and Father to DPSS and the juvenile court, including substance abuse treatment progress letters and drug testing results, were discovered to be forged. Because of this and other disruptive conduct, both parents were no longer permitted to use several drug testing facilities in the area.

On March 30, 2021, DPSS received an immediate-response referral reporting that, five days earlier, Mother had given birth to her second child, S.B. Mother had given a false name when she was admitted to the hospital to deliver S.B. and was seen outside her

6

motel with S.B. in a stroller at 2:00 a.m. walking back and forth, exhibiting odd behaviors.  Because Mother had concealed her second pregnancy and S.B.'s birth, and DPSS had recommended that the parents' reunification services be terminated as to B.B., DPSS was concerned that the risk of the parents fleeing with S.B. was high.  S.B. was taken into protective custody on March 30, 2021.

On May 24, 2021, the juvenile court terminated both parents' reunification services as to B.B. and bypassed reunification services for both parents as to S.B.

On March 21, 2022, at the combined contested selection and implementation hearing (§ 366.26) and postpermanent plan review hearing (§ 366.3) as to both B.B. and S.B., both parents failed to appear, claiming they were ill.  The hearing was continued to April 29, 2022, and the parents were ordered to appear with proof of positive COVID test results.  At the continued hearing, the parents failed to appear in person but appeared by telephone.  The court ordered DPSS to go to the address provided by Mother on the record to retrieve them and bring them to court; the parents were not at that address.  The hearing was subsequently continued to May 2, 2022, to allow for Mother to be appointed new counsel.  On May 2, 2022, after Mother was appointed new counsel, the hearing was continued to June 6, 2022.  On that date, both parents' parental rights as to B.B. and S.B. were terminated.

On March 11, 2022, DPSS received an immediate-response referral stating that Mother had given birth to a third child, C.B., in February.  That day, when the social worker went to the motel where the parents had been residing, the manager reported that

7

the parents had been evicted and escorted from the premises by law enforcement because of "destruction of property, noise complaints including domestic violence, and verbal threats to cause harm." The motel manager reported that "there were several punched holes in the walls, the headboard, microwave, television, and mirrors were broken," and that the family "was continuously engaging in arguments and police were called several times as a result." The manager reported that another tenant had reported that Mother had asked where she could purchase methamphetamine. The manager also reported that Father had threatened to kill the manager several times.

The manager had seen Mother with an infant around March 4, 2022, when Mother returned to the property seeking to retrieve some belongings. After the manager denied access, Mother "chased after her in a car with the infant in the backseat." The social worker was shown the room where the family had been staying, observed maintenance workers were present and had repaired much of the damage, and submitted a photograph of a broken mirror. The manager did not know the parents' current whereabouts.

DPSS attempted to locate the parents. The parents had cancelled several recent scheduled supervised visits with B.B. and S.B. The parents had failed to appear at hearings on the siblings' matter on March 21 and April 29, 2022, and were not at the address provided to the court on the latter date. DPSS attempted to locate the family by contacting MGM, calling and visiting several other motels in the area, and contacting county public assistance benefits workers. DPSS learned that on April 11, 2022, Mother and C.B. were seen by a benefits caseworker when Mother sought housing assistance.

8

When Mother suggested that someone from the benefits office had reported her to child protective services, the caseworker offered the DPSS social worker's contact information, but Mother declined and stated she would contact her attorney. Neither Father nor Mother was registered at the motel where Mother had told the caseworker they were residing.

On May 4, 2022, DPSS filed a petition pursuant to section 300 regarding C.B. based on both parents' history of substance abuse, the child welfare history concerning the two siblings, and domestic violence. DPSS also alleged that the parents had absconded with C.B. and requested a section 340 protective custody warrant and section 339 bench warrants for both parents. At the detention hearing on May 5, 2022, the court detained C.B. at large, ordered supervised visitation, and issued the warrants as requested. DPSS filed declarations of due diligence concerning its unsuccessful attempts to locate the parents. The parents' whereabouts continued to be unknown as of the May 26, 2022, jurisdiction/disposition hearing, which was continued to allow them to be located.

On June 20, 2022, DPSS's child abduction unit reported that the parents and C.B. had been located. The parents were arrested, and C.B. was safely taken into DPSS custody. During that encounter, after the social worker explained the protective custody warrant and its basis to Mother, Mother stated that she had completed her classes and asked to provide her certificates. She also stated she had an in-home nurse for her and C.B. but did not explain further. Mother said C.B. is healthy, and she requested that C.B.

9

be placed with MGM. Mother provided her phone number to the social worker and was told to contact the social worker after her release. C.B. appeared to be healthy, and no developmental or other concerns were noted.

The parents were released from custody the next day. When DPSS attempted to make contact using the phone number Mother had provided, it was a wrong number. The social worker was able to speak to Mother by phone on July 12, 2022, and the worker provided information regarding visitation and offered assistance with transportation. Mother declined to be interviewed, citing Father's health issues, but agreed to call the social worker at a later time. A visitation schedule was arranged, and Mother confirmed by text message on July 12, 2022, that both parents would be at their first visit with C.B. on July 14. Neither parent showed up for the visit.

Both parents appeared in court on July 20, 2022, the combined jurisdiction and disposition hearing was set for contest on September 21, and the parents were ordered to appear at the pretrial hearing set for September 7.

DPSS received an email dated July 8, 2022, from a registered nurse stating that Mother had enrolled online in a "Nurse-Family Partnership Program" in December 2021 and had completed 42 "in-home or telehealth visits" since then. The email stated that Mother had a negative drug screening on June 30, 2022, that both Mother and child had screened negative at the hospital delivery in February, and that Mother "has never been under the influence of drugs or alcohol at any of our visits." On September 14, 2022, the social worker spoke to the nurse, who reported that Mother admitted to using

methamphetamine during her previous pregnancies, lying, and evading child protective services. Mother had told the nurse at their first contact that Mother's two children had been removed from her custody, but the nurse was not aware that C.B. was the subject of dependency proceedings or that the parents had absconded with C.B. It was also reported that Mother was again pregnant, with a due date of January 19, 2023.

The parents failed to appear for the pretrial conference on September 7, 2022. Although the reporter's transcript of that hearing does not appear in the record on appeal, other evidence in the record indicates that the court was informed that the parents were absent because Father needed urgent medical care, and the court ordered the parents to provide documentation to show that. DPSS attempted to meet with the parents at their scheduled visit with C.B. on September 8, 2022, to complete drug tests and to collect documentation excusing the parents' failure to appear in court the previous day, but the parents cancelled that visit. Mother sent the social worker a picture of Father in an ambulance. In a September 14, 2022, phone call with Mother, the social worker stated that the medical documents proving they had gone for urgent care on September 7 had not been provided. Mother agreed to text the social worker pictures of medical documents but did not do so. The social worker also discussed services with Mother, and Mother stated the parents would be willing to take a drug test.

On September 15, 2022, DPSS texted both parents directing them to complete on-demand drug tests and providing referrals for anger management, substance abuse assessment, and parenting classes. The parents had previously been provided bus passes

11

for transportation to visits, in addition to the services previously provided to the parents in the siblings' cases. The parents were scheduled for weekly supervised visitation beginning July 14, 2022. As of the September 21, 2022, report, the parents had cancelled or missed three of the visits but otherwise were reported to be "engaging," playing with and feeding the baby.

At the contested jurisdiction and disposition hearing on September 21-22, 2022, Mother introduced certificates showing completion of a one-hour conflict management class in July 2021, a drug and alcohol awareness class in August 2021, a parenting class in July 2020, and a negative urine drug screen on June 30, 2022. Father introduced a parenting report, a therapist letter dated September 20, 2021, stating he was in counseling from July 16 to September 3, 2021, to address coping mechanisms for dealing with frustration and anger appropriately, and certificates showing completion of parenting classes in November 2020 and a drug and alcohol awareness class in May 2021.

The court admitted DPSS's reports regarding C.B. and took judicial notice of the prior findings, orders, and reports regarding the siblings. The court found true allegations concerning Father's criminal history, the parents' lack of stable housing, the parents' child welfare history involving substance abuse and general neglect, and the siblings' dependency history. At disposition, the court removed physical custody from both parents, denied reunification services under subdivisions (b)(10) and (b)(11) of section 361.5, reduced the parents' supervised visitation to once per month, and set a hearing under 366.26.

12

DISCUSSION

A.    *Removal from Custody*

Both parents argue that the trial court erred by removing C.B. from their custody because there is insufficient evidence that reasonable efforts were made to prevent or eliminate the need for removal. The argument lacks merit.

We review the removal order for substantial evidence. (*In re Kristin H*. (1996) 46 Cal.App.4th 1635, 1654.) Because the juvenile court must make the relevant findings by clear and convincing evidence, our review "must account for the level of confidence this standard demands." (*Conservatorship of O.B*. (2020) 9 Cal.5th 989, 995.) Accordingly, the question before us is "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id*. at pp. 995-996.)

Section 361 provides in relevant part that a child "shall not be taken from the physical custody of his or her parents . . . with whom the child resides" unless the court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the

13

minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The court must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" (§ 361, subd. (e)), and DPSS's report must include "[a] discussion of the reasonable efforts made to prevent or eliminate removal" (Cal. Rules of Court, rule 5.690(a)(1)(B)(i)).

The parents do not deny that the record contains sufficient evidence to support the court's finding of a significant danger to C.B.'s physical health, safety, or physical or emotional well-being if the child remained in the physical custody of the parents. The parents' long history of substance abuse, their failure to participate in services to address the issue, and the consequent termination of parental rights in the siblings' cases all support that finding.

Instead, the parents argue that the record does not contain sufficient evidence that DPSS made reasonable efforts to prevent or eliminate the need for removal. In particular, the parents emphasize that DPSS did not provide them with referrals to relevant programs until September 15, 2022, one week before the disposition hearing. The argument fails because, notwithstanding the provision of those referrals shortly before disposition, the record contains substantial evidence that DPSS's efforts to prevent or eliminate the need for removal were reasonable.

DPSS received the initial referral as to C.B. on March 11, 2022. Thereafter, DPSS made diligent efforts to locate the parents and C.B. in order to assess the child's safety.

14

Even though the parents were already involved in open dependency cases as to C.B.'s siblings, DPSS was unable to reach the parents despite contacting relatives and county benefits workers and calling and visiting numerous motels in the area. DPSS did not find the parents until they were arrested on June 20, 2022. Thus, for those first several months of the case, DPSS's efforts to prevent or eliminate the need for removal were clearly reasonable. Until June 20, 2022, it was impossible for DPSS to do anything more than try to find the family, and its efforts to do so were extensive.

Once the parents and C.B. were located, DPSS scheduled visitation, but the parents continued to be evasive and uncooperative. Mother provided an incorrect phone number, when later contacted she refused to be interviewed, and the parents continued to miss visits and court hearings. Again, under the circumstances of this case, DPSS's efforts to arrange for visitation and follow up with the parents constituted reasonable efforts to prevent or eliminate the need for removal. DPSS knew of the parents' history of substance abuse, evasion of contact with DPSS, and failure to participate in relevant treatment programs. Given the parents' history, it would have been reasonable to conclude that if the parents were not consistently visiting and communicating with DPSS, further efforts by DPSS to prevent removal would be futile. But DPSS made further efforts anyway, providing the parents with referrals for various programs on September 15, 2022.

15

For all of these reasons, the record contains substantial evidence supporting the court's findings that DPSS made reasonable efforts to prevent removal and that there were no reasonable means to protect the child short of removal.

*In re Ashly F*., on which both parents rely, is distinguishable because there the offending parent had voluntarily moved out of the home. (*In re Ashly F*. (2014) 225 Cal.App.4th 803, 809-810.) In this case, there is no nonoffending parent. In addition, Father suggests in his petition that he might have completed a substance abuse treatment program had he been given a referral sooner. But in March 2020 Father told DPSS that he would not benefit from substance abuse treatment, and he was given referrals to treatment programs on March 11, 2020, March 26, 2020, and August 17, 2020, but failed to complete any of them. His suggestion that he could have completed a substance abuse treatment program before disposition in this case if he had been given a referral sooner does not show that DPSS's efforts to prevent removal were not reasonable.

B. *Bypass of Reunification Services*

Mother also challenges the court's denial of family reunification services under subdivisions (b)(10) and (b)(11) of section 361.5. "Section 361.5, subdivision (b)(10) and (b)(11), authorize the denial of services to a parent who has failed to reunify with another child or whose parental rights to another child were terminated if the court finds that the parent 'has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling.'" (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914.) "The 'reasonable effort to treat' standard 'is not synonymous with "cure."'"

16

[Citation.] The statute provides a 'parent who has worked toward correcting his or her problems an opportunity to have that fact taken into consideration in subsequent proceedings.' [Citation.] To be reasonable, the parent's efforts must be more than 'lackadaisical or half-hearted.' [Citation.]" (*K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, 1393.)

Mother argues the court's finding that she has not made a reasonable effort to treat the problems that led to the siblings' removal is not supported by substantial evidence to a high probability. Mother correctly notes that domestic violence services were not included among the referrals provided to her in the siblings' cases. She argues that there is no substantial evidence that she continues to struggle with substance abuse because the court found insufficient evidence to sustain the allegation that the parents currently abuse substances, including methamphetamine. She also contends no evidence of current substance abuse can be inferred from her failure to submit to drug testing because she was under no obligation to test after reunification services were terminated, except at visitation. The argument is meritless.

Notwithstanding the juvenile court's failure to sustain the jurisdictional allegation concerning current substance abuse, Mother's substance abuse is among the "problems that led to the removal of the sibling[s]" (§ 361.5, subd. (b)(10) & (b)(11)), and the court did sustain jurisdictional allegations concerning the parents' child welfare history in the siblings' cases, the parents' history of substance abuse, and the risk it posed to C.B. (See *Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1124 [finding of no reasonable

17

effort to treat a parent's substance abuse problem does not require "definitive evidence [that the parent] was currently abusing substances" where record contains facts "from which the juvenile court could reasonably infer a continuing problem"].)  Moreover, the court reasonably inferred that the parents missed or cancelled supervised visits at which they were subject to drug testing because "they wished to willfully evade the social worker," which "willfully deprived [DPSS of] its ability to require random or on-demand testing for a significant period of time."  The court also considered Mother's participation in the Nurse-Family Partnership program but found that the nurse was not aware of "how extensive the history of substance abuse was" and did not require drug testing, and the court found there was no evidence that either parent "consistently submitted to drug testing to show they are drug-free."

The only remaining question is whether there is substantial evidence from which the court could find with high probability that Mother "has not subsequently made a reasonable effort to treat [those] problems."  (§ 361.5, subd. (b)(10) & (b)(11).)  On that question, we are required to resolve all conflicts in the evidence and draw all reasonable inferences in favor of the court's finding that she has not.  (*In re Israel T.* (2018) 30 Cal.App.5th 47, 51.)  The only evidence of any efforts by Mother to treat the substance abuse problem that led to the siblings' removal is Mother's certificate of completion of a drug and alcohol awareness course in August 2021.  A drug and alcohol *awareness* course is not a substance abuse *treatment* program, so completing that course does not constitute a reasonable effort to treat Mother's longstanding substance abuse problem.

Because the record contains no other evidence of any effort by Mother to treat her substance abuse problem, the juvenile court's finding that Mother has not made a reasonable effort to treat the problem is supported by substantial evidence.

## DISPOSITION

The petitions and requests to stay the section 366.26 hearing are denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ

J.

We concur:

FIELDS

Acting P. J.

RAPHAEL

J.